# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | : Hon. JAMES B. CLARK III |
| v. | : CRIMINAL COMPLAINT |
| CRAIG MARSHALL | : |
| | : Mag. No. 14-3109 (JBC) |

I, the undersigned, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

## COUNT ONE

From at least in or about 1999 through at least in or about August 2011, in Bergen County, in the District of New Jersey, and elsewhere, Defendant CRAIG MARSHALL did

> knowingly and intentionally conspire and agree with Jonathan Daspin, Thomas Lekargeren, and others known and unknown: (1) to devise and intend to devise a scheme and artifice to defraud clients, and to obtain money from clients, by means of false and fraudulent pretenses, representations, and promises; and, for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted writings, signs, signals, pictures, and sounds by means of wire, radio, and television communications in interstate and foreign commerce, contrary to Title 18, United States Code, Section 1343

In violation of Title 18, United States Code, Section 1349.

I further state that I am a Special Agent with the Federal Bureau of Investigation, and this complaint is based on the following facts:

SEE ATTACHMENT A

continued on the attached page and made part hereof.

_____
William R. Theroux, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,
May 27, 2014, at Newark, New Jersey


HONORABLE JAMES B. CLARK III                    _____
UNITED STATES MAGISTRATE JUDGE        Signature of Judicial Officer

Attachment A

I, William R. Theroux, am a Special Agent with the FBI of the United States Department of Justice. I am familiar with the information contained in this Complaint, either through my own direct involvement in investigative work or through conversations with law enforcement agents and others, and my examination of documents, audio recordings, and other records. Because this Complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know about the investigation. To the extent that this Complaint contains assertions concerning dates and numbers, such assertions are often approximations based upon information and evidence gathered to date. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**Relevant Background**

At all times relevant to this Complaint:

1. ConvergEx Group, LLC ("ConvergEx Group") was a parent company that owned several operating subsidiaries, including broker-dealers and related companies offering brokerage services to U.S. and foreign institutional clients.

2. G-Trade Services, LLC ("G-Trade") was a U.S. broker-dealer based in New York, New York, and a wholly owned subsidiary of ConvergEx Group.

3. ConvergEx Ltd. (formerly known as BNY Securities Limited) was a U.K. broker-dealer based in London, U.K., and a wholly owned subsidiary of ConvergEx Group.

4. ConvergEx Global Markets Limited ("CGM Limited") was a wholly owned subsidiary of ConvergEx Group incorporated and headquartered in Bermuda. CGM Limited was a registered broker-dealer in Bermuda.

5. Defendant CRAIG MARSHALL was a Trader at CGM Limited and its predecessor entities.

6. Jonathan Daspin was the Head Trader at CGM Limited and its predecessor entities.

7. CGM Limited Trader 1 was a Trader at CGM Limited and its predecessor entities.

8. Thomas Lekargeren was a Sales Trader at G-Trade.

9. G-Trade, ConvergEx Ltd., and CGM Limited (and their predecessor entities) offered equity trading services to clients through a business unit that spanned multiple corporate entities within ConvergEx Group. The business unit was called the ConvergEx Global Markets Division ("CGM Division").

10. Clients placed orders to buy or sell securities with CGM Division sales traders at G-Trade and ConvergEx Ltd. by various means, including by telephone and email. Clients agreed to pay G-Trade or ConvergEx Ltd. a commission for these services.

11. Upon receiving orders to buy or sell securities from clients, CGM Division sales traders at G-Trade and ConvergEx Ltd. routed such orders to CGM Limited by entering the information related to the orders into an order management system called G-Pro. Beginning at least by in or about March 2010, the G-Pro order management system passed data through (and stored data on) a server located in Carlstadt, New Jersey, located in Bergen County, in the District of New Jersey.

12. Traders at CGM Limited, including Defendant MARSHALL, executed an order to buy or sell a security for a client by routing the order to either a domestic U.S. broker or a broker in a foreign market where the security was traded.

13. After a local broker executed a trade, the local broker provided the traders at CGM Limited with trade execution details, including the times, prices, and number of shares of each security bought and sold.

14. Traders at CGM Limited, including Defendant MARSHALL, used G-Pro to record the information related to the execution of a client's order, including the prices that CGM Limited obtained from the local broker that executed the trade.

15. Traders at CGM Limited regularly added a mark-up (an additional amount paid for the purchase of a security) or mark-down (a reduction of the amount received for the sale of a security) to the prices obtained from the local brokers, and recorded the price inclusive of any mark-up or mark-down in G-Pro. Employees of ConvergEx Group, G-Trade, ConvergEx Ltd., and CGM Limited referred to mark-ups and mark-downs as "spread," "trading profits," or "TP."

16. After traders at CGM Limited completed a client's order, the client-facing broker—generally G-Trade or ConvergEx Ltd.—provided a trade confirmation to the client. The price per share on the confirmation included any mark-up or mark-down that CGM Limited had taken without breaking out the amount of such mark-up or mark-down separately. The confirmation separately listed the commission charged by the client-facing broker.

17. The terms and conditions agreements and trade confirmations provided by G-Trade and ConvergEx Ltd. to clients made generic disclosures that an affiliate may act in a principal capacity and earn a spread. Despite these disclosures, certain CGM Division employees, including Defendant MARSHALL, understood that many clients were in practice unaware that CGM Limited was earning spread on the clients' trades.

18. As relevant here, a time and sales report was a report that summarized each of the individual transactions, sometimes called "fills" or "prints," that were entered into to execute an

order. For each fill, an accurate time and sales report should have identified the time at which the trade was executed on the local exchange, the price at which the shares involved in the trade were either bought or sold on the local exchange, and the number of shares purchased or sold and the total price. Providing a client an accurate time and sales report for a trade on which CGM Limited had taken spread would have risked revealing to the client the existence of spread. That is, the total price from the time and sales report would have only included the cost of the securities purchased or sold exclusive of any spread, and thus the total price would have been different from the total price reported on the client's confirmation, which did include spread.

**The Fraudulent Scheme**

19.  From at least in or about 1999 through at least in or about August 2011, in Bergen County, in the District of New Jersey, and elsewhere, Defendant MARSHALL, along with Jonathan Daspin, Thomas Lekargeren and others known and unknown, conspired to hide from clients CGM Limited's practice of taking spread income, and to deceive, mislead, and make materially false statements to such clients when they requested information that could lead to the discovery that spread was being taken, in order to earn substantial spread income from those clients.

20.  It was a part of the conspiracy that when a client would request a time and sales report for a trade that had included spread, the conspirators, including Defendant MARSHALL, would create a false time and sales report containing data from other trades on the exchange that were not the client's trades in order to create a report that reflected the same total price (and number of shares) that appeared on the confirmation for the trade. The conspirators would send such false report to the client in order to deceive the client and hide the fact that spread had been included in the price.

21.  It was a part of the conspiracy that G-Trade or ConvergEx Ltd. would receive orders for the purchase or sale of securities from clients to whom a false time and sales report had been provided, or to whom affirmative misrepresentations had been made, and would transmit such orders to CGM Limited by entering the orders into G-Pro.

22.  It was a part of the conspiracy that CGM Limited would execute orders received from G-Trade and ConvergEx Ltd. for clients to whom a false time and sales report had been provided, or to whom affirmative misrepresentations had been made, and record the amount of any spread taken in G-Pro.

23.  The conspirators took a total of $5,171,394.44 worth of spread from clients who received false time and sales reports, subsequent to the transmission of the false time and sales report to each respective client.

24.  Defendant MARSHALL was interviewed by attorneys representing ConvergEx Group on August 25, 2011. During that interview, Defendant MARSHALL admitted that he had worked

with Daspin to create false time and sales reports that would match the execution price previously provided to the client. Defendant MARSHALL explained that everyone on the CGM Limited trading desk knew about the falsification of time and sales reports, that such falsification had happened two to three times in his estimation, and that the practice made him uncomfortable.

False Time and Sales Report Sent to Client 1 on June 25, 2007

25. One example of a false time and sales report Defendant MARSHALL and other conspirators created and sent to a client occurred in June 2007. On or around June 22, 2007, Client 1 made a request for a time and sales report showing the fills for the execution of the sale that day of 808,516 shares of ABN Amro Holding NV (ticker: AABA.NA) securities on the Amsterdam Stock Exchange.

26. The trade confirmation reported that 808,516 shares of ABN AMRO HOLDING NV had been sold at an average price of €34.9976, and that Client 1 was being charged a commission of €12,025.85.

27. CGM Limited's trading records show that it took spread (in the form of mark-downs) totaling approximately $13,396.82 on this trade.

28. In response to Client 1's request for a time and sales report, CGM Limited Trader 1 requested the actual fills from ConvergEx Group's IT department.

29. Client 1 made a follow-up request for the time and sales report on or around the morning of June 25, 2007.

30. In response, Defendant MARSHALL, together with Daspin, created a false time and sales report. During the preparation of the false time and sales report, Daspin sent Defendant MARSHALL an email message laying out three updates that the client had been provided during the trading day. Daspin identified the time that each update was provided, the number of shares the client was told were traded during each period, and the average price that the client had been given for each period.

31. Daspin also sent Defendant MARSHALL an email message stating, "We Time and Sales for 808,516 @ 35.0099," followed by, "We need Time and Sales for 808,516 34.9975972031." In the same email message, Daspin identified one set of figures as "needed" prints and a different set of figures as prints that "[w]e have." The price of €35.0099 is the price per share that CGM Limited received for the sale of the 808,516 shares from the local broker, while the €34.9975972031 is the price per share (which included the mark-downs) that had been reported to Client 1 in the trade confirmation (which the falsified time and sales report would have to match).

32. Daspin subsequently sent Defendant MARSHALL an email message attaching a spreadsheet of AABA.NA prints, with the subject line: "not sure if this helps."

6

33. Daspin subsequently sent Defendant MARSHALL an email message that stated, "Find me prints for these levels from 11:15 – 11:29," followed by nine rows, each of which appears to include a price and a share quantity. Notably, Daspin's earlier email message had stated that the client had been given one update at 11:14am and another update at 11:29am. The falsified time and sales report needed to contain trades that were actually conducted on the exchange during the time period and also needed to be consistent with the price reported in the 11:29am update; otherwise, Client 1 might have questioned the accuracy of the time and sales report.

34. Daspin subsequently sent an email message to a CGM Division sales trader that stated, "Please put all Prints in one spreadsheet in the least Friendly Format . . . . If possible take this out of spreadsheet Format and make a PDF – Or put this in picture file or something tricky to manipulate." Sending the false time and sales report in this format made it more difficult to check the calculations and to compare the data to the actual exchange data.

35. CGM Limited Trader 1 subsequently sent Daspin an email message that stated that the CGM Division sales trader "has checked the spreadsheet and is sending it to the client."

36. On June 25, 2007, the CGM Division sales trader transmitted a false time and sales report to Client 1. Had the CGM Division sales trader transmitted an accurate time and sales report, Client 1 could have learned from the report that CGM Limited had executed the sale of AABA.NA shares at an average price of approximately €35.00992856 per share instead of approximately €34.9976 per share as reported on the confirmation and that CGM Division had earned an undisclosed spread of approximately $13,396.82 in addition to the commission of approximately $16,159.14.

37. After the false time and sales report was transmitted to Client 1 on June 25, 2007, CGM Limited continued to use G-Pro to take spread of approximately $7,999.36 on subsequent trade orders placed by Client 1.

False Time and Sales Report Sent to Client 2 on August 11, 2009

38. A second example of Defendant MARSHALL's involvement in a false time and sales report sent to a client occurred in August 2009. On or around August 10, 2009, Client 2 made a request for a time and sales report showing the fills for the execution of two purchase orders of 284,149 shares and 105,107 shares of New York Community Bank stock on the New York Stock Exchange, on August 7, 2009.

39. The G-Trade trade confirmations sent to Client 2 reported that the orders had been executed at an average price of $11.4905 for the 284,149 shares and $11.3038 for the 105,107 shares, and that Client 2 had been charged commissions of $2,841.49 and $1,051.07 for these respective purchases.

7

40. CGM Limited's trading records show that it took spread (in the form mark-ups) totaling $10,993.77 on these two trades.

41. On or around August 11, 2009, Daspin created false time and sales reports to send to Client 2, which he sent to Defendant MARSHALL in an email message with the subject line, "DO NOT FOWARD," and a request to "please review these prints" so that Defendant MARSHALL could check the manipulated data.

42. On or around August 11, 2009, Lekargeren, a G-Trade Sales Trader, transmitted the false time and sales reports to Client 2.

43. After the false time and sales reports were sent to Client 2, CGM Limited used G-Pro to take spread of $3,795,769.60 on subsequent trade orders placed by Client 2.